# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HANGZHOU CHIC INTELLIGENT TECHNOLOGY CO., LTD. and UNICORN GLOBAL, INC., ) ) ) ) | |
| Plaintiffs, ) ) | Case No.: 20-cv-5905 |
| v. ) ) | Judge Steven C. Seeger |
| ) | Magistrate Judge M. David Weisman |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, ) ) ) ) | |
| Defendants. ) | |

## DECLARATION OF JINYUAN LEI

I, Jinyuan Lei, declare as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or based on review of business records or documents prepared for declaration or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am the manager of Unicorn Global, Inc. ("Unicorn"). Unicorn is a corporation that is based in City of Industry, California, and sells and distributes self-balancing personal transporters. Such transporters are generically known as hoverboards, electric scooters, electric bikes, and electric skateboards. Unicorn often distributes these products under licenses and other distribution agreements.

3. More specifically, Unicorn is the exclusive United States licensee and distributor of hoverboard products manufactured and exported by Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic"). For example, Unicorn sells, through affiliates and licensees, various hoverboard models embodying patented features claimed in patents licensed from Chic.

4.  Unicorn's products have earned high reviews and industry praise. For example, the FLYING-ANT Hoverboard, 6.5 Inch Self Balancing Hoverboards, and the hoverboard for Kids & Adults have maintained a 4.4 out 5 review with at least 509 reviews at the time of this declaration.



5.  Chic has received several US patents relating to hoverboard products, including but not limited to, US Patent Nos. D737,723; D738,256; D785,112, D784,195, 10,696,347, and 10,696,348 ("Patents-in-Suit") and Unicorn owns a license to the Patents-in-Suit. The Patents-in-Suit claim and illustrate ornamental features of self-balancing personal transporters. The following four tables summarily illustrate the figures in the design patents of the Patents-in-Suit.

**Table 1: Figures in the 'D723 Patent**

| Patent Number | Claim | Issue Date |
|---|---|---|
| D737,723 | FIG.1 / FIG.2 / FIG.3 / FIG.4 | September 1, 2015 |

| Patent Number | Claim | Issue Date |
|---|---|---|
| D737,723 | <br>FIG.5<br>FIG.6<br>FIG.7<br>FIG.8 | September 1, 2015 |

Table 2: Figures in the 'D256 Patent

| Patent Number D738,256 | Claim | Issue Date September 8, 2015 |
|---|---|---|
| | FIG.1 / FIG.2 / FIG.3 / FIG.4 | |

Case: 1:20-cv-05905 Document #: 14-3 Filed: 10/09/20 Page 6 of 14 PageID #:1822

| Patent Number | Claim | Issue Date |
|---|---|---|
| D738,256 | FIG.5<br>FIG.6<br>FIG.7<br>FIG.8 | September 8, 2015 |

6

**Table 3: Figures in the 'D112 Patent**

| Patent Number | Claim | Issue Date |
|---|---|---|
| D785,112 | | April 25, 2017 |
| | FIG.1 / FIG.2 / FIG.3 / FIG.4 | |

7

| Patent Number D785,112 | Claim | Issue Date April 25, 2017 |
|---|---|---|
| |  | |

**Table 4: Figures in the 'D195 Patent.**

| Patent Number D784,195 | Claim | Issue Date April 18, 2017 |
|---|---|---|
| |  | |

8

| Patent Number | Claim | Issue Date |
|---|---|---|
| D784,195 |  | April 18, 2017 |

6. The 10,696,347 patent includes 20 claims and claims are directed to various features of an innovative electric balance vehicle comprising a housing which includes a first side rotatable relative to a second side and a support structure mounted within the housing. The 10,696,348 patent includes 21 claims and the claims are also directed to various features of a sturdy and

9

easy to operate electric balance vehicle comprising a housing which includes a first side rotatable relative to a second side and a support structure mounted within the housing FIG. 2 below is an exploded view of the 10,696,347, and 10,696,348 patents:



FIG. 2

7. In 2019 Unicorn has sold at least about approximately 100,000 units via Unicorn's channels on Amazon.com, and with an average sales price of about $110.00 per unit, Unicorn generated about $11 million in sales. Based on these sales we projected a growth of 20% per year over the next two years. But units sold by unauthorized sellers, such as defendants, are exceeding those sold by Unicorn.

8. I perform, supervise, and/or direct investigations related to number of units exported from China to the United States by other sellers, including investigations related to the infringement of its hoverboard designs. Our recent investigation revealed that the defendants in this case and defendants in other similar cases employ various tactics by increase sales and evading enforcement efforts. For example, infringers like defendants will often ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

9. In addition, defendants will use misleading descriptions of goods to further evade enforcement efforts. For example, as part of the investigation, more than 100,000 "hoverboard" or "self-balancing vehicle" units that feature the patented designs and features were shipped from China to the United States in the first six months of 2020 by sellers who are not authorized by Unicorn. Such shipments exceed Unicorn's total by about 40% for the same period last year.

10. Moreover, as part of the investigation, the number of unauthorized units shipped from China to the United States could be even greater if defendants were to use descriptions other than "hoverboard" or "self-balancing vehicle." For example, shipments with a description of "scooter" exceeded 600,000 units between January 1 and June 30, 2020.

11. Our investigation has also revealed that defendants are sophisticated at concealing their identities and often use multiple fictitious names and addresses to register and operate their

network of online marketplace accounts identified in Schedule A to the Complaint (collectively, the "Defendant Internet Stores").

12. On information and belief, infringers like defendants regularly operate multiple online marketplace accounts on various platforms using the identities, such as those listed in Schedule A to the Complaint. Once they receive notice of a lawsuit, they will register new aliases with online marketplaces, as well as other unknown fictitious names and addresses, and move assets (e.g., money, sales records, and infringing products) to other locations. Such Defendant Internet Store registration patterns are one of many common tactics used by defendants to conceal their identities, the full scope and interworking of their operation, to avoid being shut down, and to evade enforcement efforts.

13. I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Infringing Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached based on one or more of the following: visual inspections of the product images listed for sale on each Defendant Internet Store look the same as the Patents-in-Suit, the price at which the Infringing Products were offered for sale undercuts the patented products, descriptions of the products, inspection and analysis of a sample of at least one infringing product, and other features commonly associated with websites selling infringing products mirror that of the patented products. Unicorn has not granted a license or any other form of permission to the defendants listed in Schedule A to the Complaint to manufacture, use, sale, offer to sell, or import products that practice the Patents-in-Suit. In addition, each defendant Internet Store offered shipping to the United States, including the state of Illinois. True and correct copies of screenshots showing the active defendant Internet Stores reviewed are attached as Exhibit 1 of the Complaint.

14.     None of the defendants listed in Schedule A to the Complaint are authorized retailers of products featuring the patented designs and features claimed in the Patents-in-Suit.

15.     Even though defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores.  The Defendant Internet Stores include notable common features, including accepted payment methods, check-out methods, metadata, illegitimate search engine optimization (SEO) tactics, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services.

16.     Infringers such as the defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways, so that they can continue operation despite Unicorn's enforcement efforts.  On information and belief, defendants maintain offshore bank accounts and regularly move funds from their PayPal accounts or other financial accounts to off-shore bank accounts outside the jurisdiction of this Court.

17.     Unfortunately, monetary damages cannot adequately compensate Unicorn for this ongoing infringement, because monetary damages fail to address the entire harm to Unicorn's control over its rights in the patented designs and features.  Furthermore, monetary damages are difficult, if not impossible, to accurately ascertain due to the inability to calculate measurable damage caused to Unicorn's control over its rights in the patented designs and features, reputation, goodwill, loss of pricing power, diminished market share, and inability to fully exploit the patented designs and features.

18.     In particular, Defendants' sales cause Unicorn's loss of pricing power, which forces Unicorn to compete in unfair pricing competition to maintain sales.  This leads to defendants to flood the marketplace with inferior quality products that not only tarnish Unicorn's goodwill—as

consumers could not distinguish products featuring patented designs and features over infringing products—and reputation. The infringement activity further damages consumer confidence in any products embodying patented designs and features. Inferior quality products with faulty parts endanger consumers' safety, resulting in a loss of future sales and market share for the entire product category. The extent of harm to Unicorn's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

19. Unicorn is further irreparably damaged due to a loss of exclusivity in its licensed patent rights to the Patents-in-Suit. Unicorn's products featuring the patented designs and features are meant to be exclusive. Unicorn's extensive marketing efforts and the Chic's innovative designs are aimed at growing and sustaining sales. When infringers sell or import goods featuring the patented designs and features without Chic's authorization, the exclusivity of Unicorn's products is eroded, resulting in a loss of unquantifiable future sales.

I declare under penalty of perjury of the law of the United States of America that the foregoing is true and correct.

Executed on the 29th day of September 2020, in the City of Industry, California.

*Jinyuan Lei*